JAMES STEVENSON *vs.* WILLIAM F. DANA.

Suffolk.   March 25, 26, 1896. — May 22, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Mortgage — Foreclosure Sale — Equity.*

If the mortgagee of land, who foreclosed the mortgage under a power of sale therein, acted in good faith, and did all that his duty required in the effort to protect the mortgagor's rights, the mere fact that the land sold for much less than it was worth is not alone enough to entitle the mortgagor to have the sale set aside.

Equity requires a foreclosure of a mortgage of land containing a power of sale to be conducted with entire good faith, and with reasonable regard for the mortgagor's interests, but it does not require the land to be sold for its value; it only requires reasonable effort to be made to avoid a sacrifice, and to obtain the value of the land.

If the mortgagee of land, in foreclosing the mortgage under a power of sale therein, did all that could be expected and more than could be demanded of him, in the way of advertising and personal persuasion, to get bidders at the sale, and the mortgagor knew of the sale and attended it with his attorney, and by his conduct in twice making a bid which he could not make good, and in protesting against the sale, did all in his power to prevent a successful auction, and was the cause of the land being bid off at several thousand dollars less than had been offered before, he is not entitled to have the sale set aside.

Where the conditions of a mortgage of land have been broken, the principal, interest, and taxes being overdue and unpaid, and a sale under the power in the mortgage has been advertised, adjournments of which sale have been made at the request of the mortgagor, who has sufficient notice of the same to protect his interest, he cannot object that the adjournments were not advertised in proper form, no such advertisement, under the circumstances, being necessary; and if, upon the hearing of a bill in equity to redeem the land, it is found that the mortgagee honestly believed that no further reasonable adjournments would be likely to get higher bids, the fact that the land was worth more than the mortgage is not enough to impeach the sale.

If the conditions of a mortgage of land are broken, the fact that the mortgagee, when foreclosing the mortgage under a power of sale therein, had in his possession a check for a part of the principal which the mortgagor had given him more than a year previously, but which the mortgagee had not been able to get paid, will not prevent a foreclosure.

BILL IN EQUITY, filed August 9, 1895, to redeem land in Boston from a mortgage.  Hearing before *Barker*, J., who reported the case for the consideration of the full court, in substance as follows.

The premises were sold on February 16, 1895, under the power contained in a mortgage, which was made by the plaintiff on September 3, 1892, for the sum of $17,000, payable in six months, with interest at six per cent per annum. On September 1, 1893, the mortgage was duly assigned to James D. Colt, Benjamin E. Bates, and John Prentiss, trustees, as successors in trust, and as such assignees they made the foreclosure sale and the deed to the defendant which is sought to be set aside.

On October 4, 1893, the mortgage being then overdue, and the interest due September 3, 1893, not having been paid, and proceedings having been instituted by the trustees to foreclose, and the plaintiff having requested an extension, an extension of the mortgage was made to March 3, 1894, with interest payable at the rate of twelve per cent per annum. On the same day the plaintiff gave the trustees his three checks, one for $510 for the interest due to September, 1893, one for $2,000 on account of the principal of the mortgage debt, and one for $78.15 to cover expenses of foreclosure proceedings. The check for $78.15 was paid on October 6, 1893; the other two were several times presented for payment, and payment was refused. The check for $510 was paid on November 7, 1893, and the check for $2,000 has never been paid, and is still in the possession of the trustees.

After the execution and record of the extension, on October 4, 1893, there was some dispute between the parties as to whether or not the extension had been by later agreement waived, and the plaintiff's attorney contended that it had been, and the plaintiff contended that he was liable to pay only six per cent because of such waiver; but the judge found that it was not waived, and remained in full force and effect.

The first mortgage for $45,000, referred to in and subject to which the mortgage in question was taken, is still outstanding.

The trustees, after October 4, 1893, often demanded of the plaintiff payment of the $2,000 check; and after March, 1894, when, under the terms of the extension, the mortgage came due, the trustees often demanded payment thereof, and threatened foreclosure proceedings thereon. The plaintiff frequently promised the trustees that he would soon pay off the mortgage. About October 15, 1894, the plaintiff stated to the trustees that

he was endeavoring to find a purchaser for their mortgage, and asked if they would assign the same in the event that he should find a purchaser therefor. The trustees told the plaintiff that they would assign, and they were always willing to do so.

Except for the sum of $1,000 hereafter mentioned, no interest was paid by the plaintiff on the trustees' mortgage after the payment due on September 3, 1893, and no interest was paid by him on the first mortgage after May 22, 1894, the trustees having paid the interest due on the first mortgage on November 22, 1894, and May 22, 1895.

During November and December, 1894, and January and February, 1895, the plaintiff was ill, and for much of the time was confined to his house, but he was in frequent communication with his attorneys, and, through his attorneys and clerk, was in frequent communication with the trustees; and about January 1, 1895, he called at the office of one of the trustees, and promised to pay the overdue interest before January 8, 1895. Both the plaintiff and his attorneys were fully advised by the trustees of their intentions, and of all their actions in the premises. The physician of the plaintiff testified that, during a large part of his illness, he was not physically or mentally in a condition to transact business.

On January 9, 1895, the trustees began the foreclosure proceedings which led to the sale to the defendant. At that time an instalment of $1,125 of interest on the first mortgage, due November 22, 1894, was overdue and unpaid, interest on the trustees' mortgage from September 3, 1893, was overdue, and the taxes assessed on May 1, 1894, amounting to about $850, were overdue. Notice of the proposed sale was published on January 9, 16, and 23 in the Boston Daily Advertiser, and also in the Boston Daily Herald on January 29 and February 2, and in the Boston Evening Transcript on January 29 and February 1, 1895. A copy of this notice was sent by the trustees to the plaintiff on January 9, 1895, by registered mail, and was duly received. On some day between January 9 and 25, the plaintiff called at the office of Bates, trustee, and offered to pay the overdue interest at twelve per cent up to January 1, 1895, if the trustees would give a further extension beyond that date at six per cent. This the trustees declined to do. The sale so

notified was to take place on February 2, 1895. On the morning of that day, William A. Hayes, one of the plaintiff's attorneys, called at the office of Bates, handed him $1,000 in bills, to be applied on account of the mortgage debt, and requested an adjournment of the sale for ten days or two weeks. Bates took the money, and said he would grant the extension asked if his co-trustees assented. Later in the day Bates returned the money, saying, in substance, that his co-trustees did not approve a postponement, but that, to avoid any surprise in consequence of their refusal, and to allow further time for negotiation, an adjournment would be made without terms until February 7. Such adjournment was made, and notice thereof was published in the Boston Daily Advertiser on February 4 and 6, 1895, and also in the Boston Evening Transcript on February 6, 1895.

The notice, which was signed by the trustees, was as follows : " Foreclosure sale under mortgage recorded libro 2084, page 493, of Suffolk Deeds (see notice of sale in Boston Daily Advertiser Jan'y 9th, 16th, and 23d, 1895) stands adjourned to Thursday, February 7th, 1895, at 12 o'clock noon, at the Real Estate Exchange and Auction Board, No. 7 Exchange Place, in the City of Boston."

On February 7, the plaintiff, by his attorney, Mr. Hayes, requested a further adjournment ; and it was agreed that, if the plaintiff would pay the sum of $1,000 on account of his then indebtedness to the trustees, and, in addition, the sum of $100 to cover foreclosure expenses already incurred, a further adjournment of nine days, to February 16, 1895, would be made. The money, $1,100, was paid, and an adjournment was accordingly duly made until February 16, 1895. The receipt given for this money was given without recital as to its application, the plaintiff's attorney having refused to take a receipt reciting it to be on account of interest. Notice of this adjournment was published in the Boston Daily Advertiser on February 11, 13, and 15.

The day of the sale was a clear, bright day of moderate temperature until after one o'clock P. M., and the plaintiff, with his attorney, Mr. Hayes, attended the sale at the Real Estate Exchange and Auction Board, on Exchange Place, in Boston.

The property was offered for sale by a duly licensed auction-

eer, who read the notices at about ten minutes past twelve o'clock. There were then present the plaintiff's attorney, his clerk, David Greer, Bates, the defendant Dana, at least three known real estate brokers, one of whom was a beneficiary of the trust, one an officer of the Exchange, the third being the broker hereinafter referred to, and some others, though how many did not clearly appear. The terms of sale were announced to be $1,000 cash, balance in ten days.

The property was struck off to Greer, who bid $20,000 in behalf of the plaintiff. Greer signed the auctioneer's memorandum, but stated that he did not have the $1,000 cash deposit. The plaintiff had, shortly before twelve o'clock, been present, and had requested that his check be taken for the deposit. This the trustees refused, but offered to take Hayes's check. The plaintiff then left, saying he would get the money. The plaintiff's agent, Greer, after signing the memorandum, requested time to go out to get the $1,000 cash, stating that the plaintiff had gone for it, and the proceedings rested for about ten minutes. The plaintiff and Greer then returned and announced that they had been unable to get the cash. The auctioneer had meantime openly stated that the sale was not finally made, and the property might again be put up, and requested bidders to wait. On the plaintiff's return, he and his attorney openly protested against the sale, being the first protest made, claiming that advantage had been taken of him, that the sale had not been legally advertised, and that disputes existed as to the amount due on the mortgage and otherwise, but not because there were no bidders present. The auctioneer, by direction of the trustees, again offered the property for sale. The defendant bid up to $19,000, as he had done before. Hayes, as the plaintiff's attorney, and at his request, bid $19,500, and the property was struck off to him. He then stated that he had not the required cash deposit. The trustees offered again to take Hayes's check for the deposit, but Hayes did not give it, and did not sign the auctioneer's memorandum. Without further delay, at 12.40 P. M., the property was again offered. At this time at least two of the real estate brokers and some others had left the room. The defendant again started the bidding at $15,000, as he had done before, under the instructions from the trustees to

bid in their interest up to, but not beyond, the amount then due, which was slightly in excess of $19,000. There was no other bid, the property was struck off to the defendant, and the foreclosure deed was duly made to him accordingly. At none of these sales did any other person bid than the representative of the plaintiff or of the trustees. The defendant made the purchase in the interest of the trustees, and paid no money on account thereof.

Shortly prior to the sale the plaintiff's attorney orally offered to pay Bates the amount of the mortgage, which was substantially the amount paid for the property by the predecessors in title of the trustees, with six per cent interest, and asked if tender of that amount would be accepted. Bates declined, and said such tender would be refused. The plaintiff did not have the amount offered at the time. No offer to pay or tender of the full amount which was due on the mortgage was ever made by the plaintiff.

The land covered by the mortgage was vacant marsh land in Boston, near the Brookline town line, on the line of Boylston Street as then projected. The plaintiff had bought it of the original second mortgagees about September, 1892, and had paid them about $23,000 in cash above the second mortgage given back as part of the purchase money. He had also paid considerable amounts for interest on the first and second mortgages, and for taxes. He had been for years one of the largest real estate operators in Boston, and owned at all times from the date of the mortgage in question to February 16, 1895, equities in Boston real estate in numerous parcels, worth in the aggregate, at the assessors' valuation, over $500,000 above all encumbrances, the parcels being assessed for $2,700,000.

On the day of the sale the first mortgage of $45,000 was outstanding, and the interest ($1,125) due on November 22, 1894, was in default. The first mortgagee had threatened both the plaintiff and the trustees with immediate foreclosure unless paid, and the trustees had promised to pay the interest if he would wait.

Proceedings instituted by the board of health of the city of Boston were pending, being brought to compel the abatement of a nuisance on the premises as low, spongy land, and the filling of the same.

The taxes assessed on May 1, 1894, were unpaid, and the amount of the plaintiff's mortgage, with interest at twelve per cent from September 1, 1893, was overdue and unpaid.

" I find that two of the trustees had asked the auctioneer to endeavor to procure bidders, and had, prior to the sale, made some individual effort among brokers and others to induce outside purchasers to attend the sale and bid on the property, and that at least one broker did, in consequence, attend with the intent to bid; but this broker had advised the trustees that, in his opinion, the property was worth a sum less than the amount due on the two mortgages, and he made no bid at the sale. There was no evidence that the plaintiff made, or caused to be made, any effort to procure bidders, or, prior to the time of sale, made any objection, request, or suggestion regarding notices.

" The evidence regarding the fair market value of the property was conflicting. I find that the trustees acted in the premises in good faith, and honestly believed that no further reasonable adjournments would be likely to lead to the obtaining of higher bids.

" I find that the fair market value of the property, free and clear of encumbrance, on February 16, 1895, exceeded the amount due under the two mortgages.

" I find that during the years 1894 and 1895 the plaintiff could have borrowed on his real estate equities more than enough to satisfy the debt to the trustees, and that he voluntarily purchased during 1894 at least two parcels of land in Boston.

" The defendant offered at the trial to deposit the $2,000 check of the plaintiff in court for cancellation, and also offered to give a valid release of any deficiency claim, if the sale was to stand. This offer was made after all the evidence on both sides was in, and during the argument of the defendant's counsel.

" I find that the trustees, at the time of the trial, had expended considerable amounts for filling the land, and other permanent improvements.

" I was of opinion that the plaintiff should be allowed to redeem on payment of the mortgage debt, with twelve per cent interest from September 3, 1893, and any other amounts properly

due.  I entered a decree accordingly, and, at the request of the defendant, report the case for the consideration of the full court."

Such order was to be entered as justice and equity might require.

*F. Rackemann,* for the defendant.

*R. M. Morse & H. M. Williams,* for the plaintiff.

HOLMES, J.  It is found that the trustees who foreclosed the mortgage acted in good faith, and it is plain on the evidence that they did all that their duty required in the effort to protect the plaintiff's rights.  If the foreclosure sale is to be opened, it must be on the technical ground that, in spite of their intent and belief, the trustees made some mistake of which the plaintiff could complain.

We find no such mistake.  The mere fact, if it be one, that the land sold for a good deal less than it was worth, is not enough to make out a case for the plaintiff.  The land was bought by the holders of the mortgage, and we suppose that mortgagees rarely offer more than the amount of the debt, yet it would not be desirable to invalidate their purchases wholesale.  Equity requires a foreclosure to be conducted with entire good faith, and with reasonable regard for the mortgagor's interests, it is true, but after a certain point it must respect bargains.  It does not require the land to be sold for its value.  It only requires reasonable efforts to be made to avoid a sacrifice, and to obtain the value of the land.  See *Austin* v. *Hatch,* 159 Mass. 198; *Learned* v. *Geer,* 139 Mass. 31; *King* v. *Bronson,* 122 Mass. 122, 128.  The trustees did all that could be expected, and more than could be demanded of them, in the way of advertising and personal persuasion, to get bidders at the sale.  The plaintiff knew of the sale, and when it came off was there with his lawyer.  By his conduct in twice making a bid which he could not make good, and in protesting against the sale, he did all in his power to prevent a successful auction, and was the cause of the land being bid off at $4,000 less than had been offered before.

It is said that the adjournments were not advertised in proper form, and that would be true if it had been necessary to advertise adjournments.  But under the circumstances of this case it was not necessary.  See *Hosmer* v. *Sargent,* 8 Allen, 97.  The adjournments were all made at the plaintiff's request, and suffi-

cient notice was given to protect his interest. When the sale opened there were a number of persons present, and if it had been finished at once, as it would have been but for the plaintiff, there could have been no question that it was fair, so far as the gathering of possible bidders was concerned. It is found that the trustees honestly believed that no further reasonable adjournments would be likely to get higher bids. There is nothing but the finding that the land was worth more than the mortgage to lead to a different belief, and that is not enough to impeach the sale.

The sale was on February 16, 1895. It is objected that the trustees then had in their hands a check for $2,000, which the plaintiff had given them in October, 1893, on account of the principal, but which the trustees had not been able to get paid. But the conditions of the mortgage were broken, and the possession of the check did not prevent a foreclosure. It is true that the judge who tried the case allowed the plaintiff to redeem on paying twelve per cent interest. But the facts on which the decree was based are reported, and the question before us really is a question of how far the court will go in reopening sales. We are not prepared to go quite so far as this. It is true that the plaintiff probably will suffer a loss, but he has brought it on himself by his own conduct.

*Bill dismissed.*